**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| INCUBADORA MEXICANA, S.A. de C.V., and INCUBADORAS RANCHO GRANDE S.A. de C.V., <br><br> Plaintiffs, <br><br> vs. <br><br> ZOETIS, INC. and PFIZER, INC., <br><br> Defendants. | Case No. 2:15-cv-00216-WB |

**PLAINTIFFS' MOTION FOR SANCTIONS FOR**
**VIOLATING FEDERAL RULE OF CIVIL PROCEDURE 11**

Plaintiffs, Incubadoras Rancho Grande and Incubadoras Mexicanas, move for sanctions against Defendants, Pfizer, Inc. and Zoetis, Inc., for violations of Federal Rule of Civil Procedure 11, and, in support of this Motion, state as follows:

**1.     INTRODUCTION**

Defendants have sought three times to have Plaintiffs' claims dismissed, most recently with the filing of a highly questionable, renewed Motion to Dismiss pursuant to the doctrine of *forum non conviens*. Each time, Defendants have focused principally on the role of two Mexican companies, both agents of Defendants, that participated in the delivery of at least some of the shipments of defective vaccine to Plaintiffs' chicken hatcheries. Throughout the motions, Defendants have insisted that these entities were crucial to this case, that they were necessary parties and that discovery from these two distributors was essential to the fair defense of this case.

Newly produced documents, however, clearly show that these two Mexican distributors had nothing to do with the lots of vaccine becoming ineffective.  Moreover, these newly available documents show that Defendants have never suspected these two distributors of any meaningful role in this case.  In fact, according to Defendants' own detailed investigation and according to records that pre-date the filing of this action, these two Mexican distributors had nothing to do with the lots of vaccine becoming ineffective.

Perhaps even more important, for purposes of this Motion, these newly discovered documents include admissions by Defendants to the United States Department of Agriculture that demonstrate that Defendants knowingly misled Plaintiffs and this Court by making frivolous arguments and unsupported representations of the facts.  Defendants' actions also have served to harass Plaintiffs, drive up the litigation costs and impose needless and groundless delays in this litigation.

For these reasons, as discussed more fully below, Defendants should be sanctioned pursuant to Federal Rule of Civil Procedure 11.[1]

**2.     RELEVANT PROCEDURAL HISTORY**

This breach of warranty case involves tens of millions of dollars of losses from massive poultry death following the administration of Defendants' defective vaccine at two egg-laying chicken facilities in Mexico.  Defendants Pfizer, through its Animal Health Division, and Zoetis, which was spun off from Pfizer during the events at issue in this case, warranted that their anti-viral vaccine, Poulvac, was effective and would be safely delivered through a reliable supply

---

[1] On August 15, 2016, Counsel for both sides conferred, at which time Plaintiffs' counsel gave notice to Defendants as to the basis of the Motion for Sanctions and asked that the Renewed Motion to Transfer be withdrawn. Defendants' counsel stated at that time that the motion would not be withdrawn.  On August 22, 2016, Plaintiffs gave formal notice, pursuant to Federal Rule of Civil Procedure 11(c)(2).  More than 21 days have passed and so the filing of this Motion is timely.

network. Because the ampules of vaccine need to be maintained at all times below a certain temperature, the supply chain is also referred to as the "cold chain." Every step of the "cold chain" was controlled by Defendants.

On May 21, 2015, Defendant Zoetis filed a Motion to Dismiss the Complaint. [Docket 13]. One of the main bases for dismissing the Complaint, Defendant argued, was the failure under Federal Rule 19 to join two Mexican vaccine distributors, Distribuiadora Agropecuaria de Sonora ("DAS") and Insumos Agropecuarios Algran ("Algran"). Plaintiffs filed an Amended Complaint on June 15, 2015. [Docket 18]. Defendants renewed the Motion to Dismiss on June 29, 2015, again arguing that the Mexican distributors, DAS and Algran were necessary parties to this action that needed to be joined but could not be joined [Docket 29]. On September 16, 2015, the Court denied Defendants' Motion as to Rule 19, finding that DAS and Algran did not have to be joined in this action (and, therefore, finding it unnecessary to reach the question of whether these entities were indispensable.) Docket 38 at p.7.[2]

On May 21, 2015, Defendants also filed a Motion to Dismiss pursuant to the doctrine of *forum non conveniens*. [Docket No. 14]. Among the arguments Defendants raised in support of this motion was the false claim that there were documents in Mexico that were crucial to Defendants' defense that Defendants would need to invoke the cumbersome and time-consuming Hague Convention procedures to obtain this discovery if this action remained in this Court. *Id*. at p.12. Defendants also argued that this action needed to be dismissed because they would be unable to implead the distributors, DAS and Algran, due to lack of personal jurisdiction over those entities. *Id*. at p.14. The Court denied Defendants' motion more than one year ago and rejected these arguments. [Docket 34, July 31, 2015, p. 11-12].

---

[2] The Court did grant Defendants' motion to dismiss certain of Plaintiffs' tort-based claims pursuant to the business loss doctrine. *Id*. at p. 15. The Court also struck Plaintiffs' fraud claim and certain warranty claims as to Defendant Pfizer only. *Id*.

Nearly one year later, and following months of extensive and substantive discovery, Defendants filed a renewed Motion to Dismiss pursuant to the doctrine of *forum non conveniens*. [Docket 57, July 13, 2016]. Once again, the focus of Defendants' arguments for dismissal was directed significantly to the role of the two Mexican distributors, DAS and Algran. Defendants again asserted that Plaintiffs had contracted for purchase of vaccine with DAS and Algran, a disputed fact of no importance to Plaintiffs' warranty claims against Defendants. *Id*. at p.3. Indeed, as noted above, the Court had already rejected this issue as relevant to the determination of Defendants' *forum non conveniens* motion.

Defendants' renewed motion also detailed its failed attempts to obtain evidence from DAS and Algran after extensive motion practice involving the Hague Convention. *Id*. at pp 4-6. Defendants claimed to "have shown the practical problems with compelling production of documents and attendance of unwilling witnesses in a foreign jurisdiction" and that they had made "a good faith effort in obtaining testimony and documents of the Algran and DAS distributors through the Hague Convention, but that process has been ineffective." *Id*. at p.18.

This Court denied Defendants' Renewed Motion to Dismiss on August 29, 2016. [Docket 68].

### 3. PERTINENT FACTS

Defendants have not been candid with this Court about the role of DAS and Algran. Defendants' misrepresentations and intentional omissions about the role of the two vaccine distributors have been in bad faith, for the purpose of manufacturing false bases to dismiss; to harass Plaintiffs by driving up litigation costs; and to create needless and groundless delay in the prosecution of the claims in this case.

### A. Defendants know and have known that DAS and Algran were not Involved with the lots of Poulvac vaccine becoming ineffective

Based on documents recently produced by Defendants in this action, we now know the following:

      i. Beginning in January 2014, Defendant Zoetis began investigating claims from Pilgrims, a chicken producer with operations in Mexico and the United States, of Marek-related deaths at its Mexican poultry production facilities. Marek is a deadly virus in chickens. Pilgrims (and Plantiffs IMSA and Rancho Grande) used and relied on Defendants' Poulvac vaccine to inoculate day-old chicks against Marek. *See, e.g.,* Email, dated January 15, 2014, from Bernardo Romero to Carlos Porragas and others, discussing the Marek issue at Pilgrim's, a copy of which is attached as Exhibit A.

      ii. From the beginning, Zoetis' internal investigation into the Marek outbreak was monitored, supported and coordinated at the highest levels of corporate management in the United States. *See, e.g.*, Email, dated January 15, 2014, from Carlos Porragas to Steve Manley, Regional Director, Poultry, for Canada and Latin America, a copy of which is attached as Exhibit B. (Mr. Manley maintains his office at Zoetis' corporate headquarters in New Jersey.)

      iii. Plaintiffs IMSA and Rancho Grande reported to Zoetis massive losses of chickens due to Marek in the Spring of 2014.

      iv. Zoetis' internal investigation involved a large team of Zoetis personnel and managers, coordinated from various offices in the United States and included visits to affected farms; meeting with veterinary and production managers at affected farms, including those owned by Plaintiffs; taking various necropsy samples; rounding up unused portions of suspected lots of ineffective vaccines; submitting vaccine samples to various

laboratories for testing in the United States; reviewing procedures and samples and records from manufacturing quality control operations; hiring experts in the United States to make site visits; and meeting with representatives from its agents involved in the supply and distribution chain.

    v. Zoetis' internal investigation focused on whether the cold chain had been maintained along the supply route.  Since the Poulvac vaccine involves a live virus, the temperature needs to be carefully maintained during storage and transport.

    vi. Based on inquiries to the affected customers, Pilgrims, Rancho Grande and IMSA, Zoetis was able to determine which lots of vaccine were likely affected.  This led Defendant to its storage facility in Mexico City.

    vii. Zoetis' lengthy investigation found no fault on the part of DAS or Algran.  In fact, Defendant Zoetis acknowledged, in several submissions to the United States Department of Agriculture, that the break in the cold chain occurred at the storage and distribution center in Mexico City and that this facility was under the direct control of Defendants.  *See* Letter from Julie Koester, Senior Specialist Regulatory Compliance, Zoetis, to Dr. William L. Huis, Facilities Manager, U.S.D.A., dated May 27, 2014, a copy of which is attached as Exhibit C (referring to "the internal hold at Ryder, the Zoetis controlled distribution center in Mexico City. . . ").

    viii. In a follow up letter to the USDA, Zoetis reported that in July 2014 it had decided to issue a recall of certain lots of affected vaccine and that the results of its investigation had "determined that certain tanks containing ampoules from the impacted lots may have been exposed to a temperature excursion at the storage facility in Mexico between June 2013 and September 2013.  *See* Letter from Carolyn Ross, Manager/TL Regulatory Compliance, Zoetis to USDA, dated July 30, 2014, a copy of which is attached as Exhibit D.

Based on the above -- and many other documents as well that Defendants have produced recently -- it is clear that the cause of the lots of vaccine becoming ineffective occurred *before* the distributors, DAS and Algran, ever came into possession of the shipments for final delivery to Plaintiffs. Defendants knew this well before they filed their Motions to dismiss in May 2015.

### B. Defendants invented the need to invoke the Hague Convention to Obtain documents from DAS and Algran.

Defendants argued in their motions to dismiss that it would be so difficult and onerous to obtain discovery from DAS and Algran, the vaccine distributors in Mexico. Then, in the renewed Motion to Dismiss, Defendants detailed their struggles with the Mexican court system as they have tried to enforce their Hague Convention subpoenas. Leaving aside the irony of Defendants arguing to transfer this action far away from their own backyard, and the familiar practices of this federal court, to a distant land where they have allegedly experienced the vagaries of the foreign judicial system, Defendants' discovery struggles are, in fact, a ruse.

First, both distributors are agents of Zoetis. As Cuauhtemoc Mota, the owner of DAS, explained in an Affidavit dated August 8, 2016, Defendants have a distribution contract with DAS that specifies that Defendants are responsible "to ensure that the vaccine was ready and acceptable for distribution." *See* Mota Affidavit attached as Exhibit E at para. 6. Defendants -- and not DAS -- provided all services to the customer, including marketing materials, educational information and training relating to the vaccine. *Id*. at para. 7. Pursuant to the distribution agreement, Defendants determined the price of the product sold to Rancho Grande. *Id*. at para 8. Perhaps most important, as relates to getting discovery documents, the distribution agreement with Defendants made clear that Defendants have the right to access DAS' facilities and records." *Id*. at para. 9. Indeed, as Defendants' recent document production makes clear, Defendants have requested documents from DAS and Algran numerous times and have received

documents from the distributors just for the asking, without needing to invoke any formal requests, let alone an elaborate procedure pursuant to the Hague Convention.

Defendants did not have to invoke the Hague Convention and burden this Court and Plaintiffs with needless motions so that a foreign subpoena could be served in Mexico. All Defendants had to do was ask their agent for documents, something Defendants never actually bothered to do in connection with this case, though Defendants made many requests for information and documents to the distributors before this action was even filed. As Mr. Mota explained in his Affidavit, "Pfizer/Zoetis has never questioned me or anyone affiliated with DAS regarding the circumstances that led to the 2014 recall of certain lots of its Pfizer/Zoetis Poulvac Marek vaccine. *Id*. at para. 11. Nor did Defendants ever simply ask DAS to provide documents that might be related to the issues in this action. *Id*. at para. 13.[3] Before this action was filed, and before Defendants began manufacturing arguments for dismissing this case, Defendants knew well that all they had to do was ask for information from DAS and that they could expect cooperation.

Defendants may argue again that they should remain free to explore in what remains of discovery whether the distributors had anything to do with the vaccine became ineffective. While it is true that Defendants can spend (or waste) their time as they see fit, the evidentiary record already has established, beyond any credible dispute, that neither DAS nor Algran in any way contributed to the various lots of vaccine becoming ineffective. For example,

- The Distribution Agreements between Defendants and Algran and DAS clearly state that it is Defendants' obligation to deliver the products ready and finished for the distribution and sale by the Distributor, at the place indicated by the Distributor. *See*, *e.g.*, Defendants' agreement with DAS, attached as Exhibit F.

---

[3] Plaintiffs' counsel spoke recently by telephone with a representative from Algran, the other distributor, and established essentially the same facts as to Algran. See Declaration of Glenn A. Ellis, Esquire, dated August 15, 2016, attached as Exhibit G.

- Pursuant to the agreement between Defendants and their warehouse operator in Mexico City, Defendants are responsible for:

| | | | |
|---|---|---|---|
| 10.2 | Ensure that Products are secured for transport and that precautions are taken to ensure that the products are not subjected to unacceptable degrees of heat, cold, light, moisture, etc., and will not be contaminated during transport to the customers. | = | X |
| 10.3 | Arrange transport of Products to designated delivery point under labelled storage conditions (or allowed transit temperature specifications), using approved carriers and obtain verification of delivery. | = | X |

   ZOETPVL-98-9.  A copy of this document is attached as Exhibit H.

- As noted by Defendant Zoetis, the warehouse in Mexico City is under its exclusive control. ZOETPVL-4274-6.  A copy of this document is attached as Exhibit I.

- As early as April 17, 2014, Defendant Zoetis "believe[d] that the product was improperly stored at the warehouse in Mexico" resulting in it becoming ineffective.  ZOETPVL-4337-8.  A copy of this document is attached as Exhibit J.

- According to its own internal investigation documents, Defendant Zoetis did not have any procedures in place to monitor nitrogen levels and temperatures of product stored in nitrogen to ensure adequate storage temperatures are maintained.  ZOETPVL-4272.  A copy of this document is attached as Exhibit K.

- On May 7, 2014, Defendant Zoetis wrote to the USDA to inform them that they had sent someone to inspect the samples at the warehouse and found that "the testing performed at the contract facility in Mexico confirmed the initial results of 0 PFU/dose or no live virus present." ZOETPLV-4286.  A copy of this document is attached as Exhibit L.

- On May 27, 2014, Defendant Zoetis reported to the USDA that "as a result of [its] investigation, Ryder has instituted a series of CAPAs including log books to document incoming tank condition, tank numbers, level of LN2 and all handling and transfer involved in distributing our liquid nitrogen products." ZOETPVL-4282-3.  These CAPA procedures were put in place by Defendant Zoetis through a modification of the contract between Defendant Zoetis and Ryder de Mexico in March of 2014.  ZOETPVL-2640_001.  Copies of these documents are attached as Exhibit M.

- An email from Mr. Romero to his boss Steve Manley, on June 23, 2014, states that Defendant Zoetis pulled and tested samples (Lots 1083591, 1071251, 1071255) directly from the Zoetis controlled warehouse and found that they had 0 PFU's, which is the measure of effectiveness.  ZOETPVL-3036.  A copy of this document is attached as Exhibit N.

In light of the Defendants' own investigation, as evidenced in Defendants' own, recently-produced records, and the fact that the lot samples pulled and tested, which were never touched or manipulated by any distributor, were found to be ineffective, it is beyond dispute that the vaccine ampules were not mishandled by DAS and Algran.  Thus, Defendants' discovery of DAS and Algran is a ruse; none of this discovery relates to any claim or defense in this case.

**4.     ARGUMENT**

Defendants have misrepresented to this Court important information about the role of the vaccine distributors and have done so for a purpose that demonstrates bad faith.  Defendants' recent document production confirms materials that Defendants knew critical statements made to the Court and to Plaintiffs about the distributors were false when they were made.

**A.     Standard for Rule 11**

Federal Rule of Civil Procedure 11 provides in part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name . . . The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading . . . ; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact . . . , and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation . . .  If a pleading . . . is signed in violation of this rule, the court . . . shall impose upon the person who signed it, a represented party, or both, an appropriate sanction . . .

The Supreme Court has concluded that Rule 11 "imposes on any party who signs a pleading ... an affirmative duty to conduct a reasonable inquiry into the facts and the law before

filing, and that the applicable standard is one of reasonableness under the circumstances." *Business Guides, Inc. v. Chromatic Communications Enter.*, 111 S.Ct. 922, 933 (1991).

The Court held that "Rule 11 imposes an objective standard of reasonable inquiry on represented parties who sign papers or pleadings." *Id.* 111 S.Ct. at 934–35. The rule "imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact . . ." *Cooter & Gell,* 110 S.Ct. at 2454. That standard is well established in this circuit.

In *Lieb v. Topstone Indus.,* 788 F.2d 151, 157 (3d Cir.1986), the Third Circuit noted that the Rule 11 test "is now an objective one of reasonableness" and seeks to discourage pleadings "without factual foundation, even though the paper was not filed in subjective bad faith." Rule 11 also seeks to ensure a pleading is not used for "an improper purpose, such as to cause harassment, undue delay, or needless increase in litigation expense." *Id.; see also Business Guides,* 111 S.Ct. at 934 (the "main objective" of Rule 11 is "to deter baseless filings and curb abuses"). Obviously, the rule was designed to be equally applicable to defendants and to plaintiffs.

**B.     Defendants Violated Rule 11**

The Third Circuit's decision in *Lony II* is instructive regarding what considerations are appropriate in assessing a Rule 11 sanctions motion and is especially *a propos* here because that case involved a Defendant who, like Defendants here, filed a renewed motion to dismiss for *forum non conveniens* long after the initial motion was rejected. *Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 608-17 (3d Cir. 1991)

In *Lony,* the plaintiff contended that sanctions were warranted because DuPont (1) pursued its *forum non conveniens* motion in an attempt to harass and impose costs on plaintiff

and (2) denied a key fact relevant to liability which it admitted only belatedly. The Third Circuit noted that the first allegation, standing alone, was without merit since "DuPont had a right to move for *forum non conveniens* dismissal, and nothing precluded a renewal of its motion to dismiss on that ground." *Id.* The Third Circuit also noted "nor do we, using an objective standard, regard its motions as harassment" since "DuPont's arguments presented close questions, as the two appeals on this issue demonstrate." *Id.*

The Third Circuit, however, noted that plaintiff's "second basis for sanctions [was] more substantial [because] [f]or the first eighteen months of this litigation, DuPont flatly denied the following two allegations in Lony's complaint:

> 9. Cellophane produced by Du Pont, including type K160–DB23, contains DEG, and at all relevant times, Du Pont was aware of this fact.
>
> 10. When polyethylene glycol is used as a softener and plasticizer in cellophane production, the resulting cellophane will contain DEG. At all relevant times, Du Pont was aware of this fact.

*Id. citing* App. at 7–8, 30. DuPont's answer, signed by counsel, simply denied these allegations, a position DuPont maintained in the first appeal. *See Lony I,* 886 F.2d at 636 ("DuPont denies that the use of PEG as a raw material caused DEG to be present in its cellophane"). The Third Circuit noted that "in December 1989, when this case was on remand from our prior decision, DuPont for the first time offered to stipulate that it will not dispute Lony's allegations that the use of PEG in the manufacture of DuPont cellophane type K160–DB23 would result in small amounts of DEG in the cellophane. *Id. at citing* App. at 1351. DuPont offered no explanation for this belated admission." *Id.*

In other words, it is not the fact alone that Defendants' Renewed Motion to Dismiss that is sanctionable, but rather that the claimed basis was knowingly so without merit and that Defendants' representations in the motion were knowingly so misleading and false. Defendants

here can offer no explanation as to why they so blatantly misrepresented to the Court the importance of the Mexican distributors (when Defendants knew they had nothing to do with causing the vaccine lots to become ineffective) and why they conjured up a false discovery snafu in the Mexican courts (when Defendants knew all they had to do was pick up the phone and call them).

Defendants' knowingly false submissions to the Court constitute bad faith and are grounds for sanction under Rule 11. Defendants' conduct was intended to create a false basis for dismissing Plaintiffs' action. This has resulted in harassment of Plaintiffs, wasting of the Court's and the parties' time and resources, and delays in the efficient prosecution of the claims in this action.

### 5. CONCLUSION

For these reasons, Defendants should be sanctioned in a manner or in an amount the Court deems appropriate. At the very least, Plaintiffs submit, Defendants should be made to reimburse all reasonable costs associated with Plaintiffs' responding to all three Motions to Dismiss.

    Respectfully,

    **FREIWALD LAW, P.C.**

By:   /s/ Aaron J. Freiwald
      AARON J. FREIWALD, ESQUIRE
      GLENN A. ELLIS, ESQUIRE
      1500 Walnut St., 18th Floor
      Philadelphia, PA 19131
      Tele: 215-875-8000
      Fax: 215-875-8575
      **Counsel for Plaintiffs**

Dated: September 14, 2016

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INCUBADORA MEXICANA, SA DE CV AND INCUBADORAS RANCHO GRANDE SA DE CV<br><br>　　　　Plaintiffs<br><br>　　v.<br><br>ZOETIS, INC. AND PFIZER, INC.<br>　　　　Defendants | No. 15-00216 |

**CERTIFICATE OF SERVICE**

　　I, Aaron J. Freiwald, hereby certify that service of a true and correct copy of the foregoing Plaintiffs' Motion for Violating Federal Rule of Civil Procedure 11 was served upon the following on this date, via electronic mail, as follows:

>　Joseph H. Blum, Esquire
>　Sean P. Wajert, Esquire
>　Shook, Hardy & Bacon L.L.P.
>　Two Commerce Square
>　2001 Market Street
>　Philadelphia, PA  19103-7014

　　　　　　　　　　　　　　　　　　　　/s/  Aaron J. Freiwald
　　　　　　　　　　　　　　　　　　　　AARON J. FREIWALD, ESQUIRE
　　　　　　　　　　　　　　　　　　　　Counsel for Plaintiffs